JUDGE SCHEINDLIN

'08 CIV 3971

SONNENSCHEIN NATH & ROSENTHAL LLP
Robert J. Lanza
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700 (telephone)
(212) 768- 6800 (fax)

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



RECEIVED
APR 28 2008
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| NATIONAL LACROSSE LEAGUE, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| SMS SPORTWORKS ENTERTAINMENT | ) |
| AND STARLIGHT SPORTS & | ) |
| ENTERTAINMENT INC., d/b/a | ) |
| VANCOUVER RAVENS LACROSSE | ) |
| CLUB, INC., DAVID STADNYK, | ) |
| TOM MAYENKNECHT, ROBERT | ) |
| SMART, MSA SPORTWORKS | ) |
| ENTERTAINMENT, INC., MSA | ) |
| SPORTWORKS LTD., PAUL REINHART, | ) |
| VANCOUVER RAVENS LACROSSE | ) |
| CLUB LIMITED PARTNERSHIP, | ) |
| PARTNERS GROUP 1INC., RAJ KALRA, | ) |
| PARTNERS GROUP RAVENS, INC., | ) |
| CONSOLIDATED GENERAL, INC., | ) |
| WESTCAP BUSINESS | ) |
| CENTRE INC., STEVEN BRIAN | ) |
| FRIEDLAND, AS TRUSTEE FOR THE | ) |
| SO CALLED SECURED | ) |
| NOTE HOLDERS, d/b/a WESTERN | ) |
| LIQUID CAPITAL, AND | ) |
| CB WILSON CAPITAL LTD., | ) |
| | ) |
| Defendants. | ) |
| | ) |

08 CIV COMPLAINT

Plaintiff National Lacrosse League, by its attorneys, Sonnenschein Nath & Rosenthal,

LLP, alleges for its complaint against the defendants SMS Sportworks Entertainment and

Starlight Sports & Entertainment Inc., d/b/a the Vancouver Ravens Lacrosse Club Inc., David

Stadnyk, Tom Mayenknecht, Robert Smart, MSA Sportworks Entertainment, Inc., MSA

Sportworks Ltd., Paul Reinhart, Vancouver Ravens Lacrosse Club Limited Partnership, Partners

Group, 1Inc., Raj Kalra, Partners Group Ravens, Inc.,  Consolidated General Inc., Westcap Business Centre, Inc., Steven Brian Friedland, as Trustee for the so called secured note holders, d/b/a Western Liquid Capital, and CB Wilson Capital Ltd. as follows:

## **NATURE OF THE ACTION**

1.      Plaintiff National Lacrosse League (the "NLL") is an organization comprised of various member clubs licensed to play indoor lacrosse in specific territories, on terms and conditions set forth in the National Lacrosse League Constitution, By-Laws, and League Regulations and Policies promulgated thereunder.

2.      Defendants SMS Sportworks Entertainment and Starlight Sports & Entertainment Inc., d/b/a the Vancouver Ravens Lacrosse Club, David Stadnyk, Tom Mayenknecht, Robert Smart and Paul Reinhart previously applied for, and were granted membership rights in the NLL to operate a member club in Vancouver, British Columbia.   The remaining defendants are comprised of individuals and entities that may improperly attempt to assert interests in the Vancouver club.

3.      In this action, the NLL seeks:  (1) a declaration pursuant to 28 U.S.C. § 2201, that any membership rights previously owned by defendants SMS Sportworks Entertainment and Starlight Sports & Entertainment Inc., d/b/a the Vancouver Ravens Lacrosse Club, David Stadnyk, Tom Mayenknecht, Robert Smart, Paul Reinhart, MSA Sportworks Entertainment, Inc. and/or MSA Sportworks Ltd. have automatically terminated under the NLL Constitution and that such rights have lawfully and properly reverted back to the NLL; (2) damages from defendants SMS Sportworks Entertainment and Starlight Sports & Entertainment Inc., d/b/a the Vancouver Ravens Lacrosse Club, David Stadnyk, Tom Mayenknecht, Robert Smart, Paul Reinhart, MSA Sportworks Entertainment, Inc. and/or MSA Sportworks Ltd. for breach of contract in an amount in excess of $4.0 million; (3) a declaration pursuant to 28 U.S.C. § 2201, that defendants Paul

Reinhart and the Vancouver Ravens Lacrosse Club Limited Partnership have no membership interests in the NLL; (4) a declaration pursuant to 28 U.S.C. § 2201, that Partners Group, 1Inc., Raj Kalra, Partners Group Ravens, Inc. and Consolidated General Inc. have no membership interests in the NLL; (5) damages from defendants Partners Group, 1Inc., Raj Kalra, Partners Group Ravens, Inc. and Consolidated General Inc. for breach of contract in an amount in excess of $2.5 million; (6) a declaration pursuant to 28 U.S.C. § 2201, that Westcap Business Centre, Inc. has no membership interests in the NLL; (7) a declaration pursuant to 28 U.S.C. § 2201, that Steven Brian Friedland, d/b/a Western Liquid Capital, as Trustee for the so called secured note holders, has no membership interests in and/or liens against the NLL; and (8) a declaration pursuant to 28 U.S.C. § 2201, that CB Wilson Capital Ltd. has no membership interest in the NLL.

## JURISDICTION AND VENUE

4.      The jurisdiction of this Court is based upon diversity of citizenship between the parties, pursuant to 28 U.S.C. § 1332(a)(2). As explained below, the parties are of diverse citizenship and the amount-in-controversy, exclusive of interest and costs exceeds $75,000.

5.      Venue is proper in this District, pursuant to 28 USC § 1391(a)(2), because a substantial part of the events giving rise to the claims asserted in this action occurred in the Southern District of New York, and the NLL's principal place of business is located in the Southern District of New York.

## THE PARTIES

6.      The NLL is a New York not-for-profit organization with its principal place of business located at 9 East 45th Street, 5th Floor, New York, New York 10017.

7.      On information and belief, SMS Sportworks Entertainment ("SMS") is a corporation organized under the laws of Canada, having its principal place of business located at

- 3 -

Suite 100-856 Homer Street, Vancouver, B.C., Canada.

8.     On information and belief, Starlight Sports and Entertainment Inc. ("Starlight") is a corporation organized under the laws of Canada, having its principal place of business located at Suite 100-856 Homer Street, Vancouver, B.C., Canada.

9.     On information and belief, David Stadnyk is a citizen of Canada, who resides at 4756 Ormond Drive, Vancouver, B.C., Canada.

10.     On information and belief, Tom Mayenknecht is a citizen of Canada, who resides at 552 St. Andrews Road, West Vancouver, B.C., Canada V7S 1V2.

11.     On information and belief, Robert Smart is a citizen of Canada, who resides at 662 Alpine Court, North Vancouver, B.C., Canada V7R 218.

12.     On information and belief, MSA Sportworks Entertainment, Inc. ("MSA Inc."), is a corporation organized under the laws of Canada, having its principal place of business located at 115B 19705 Fraser Highway, Langley, B.C. Canada V3A 7E9.

13.     On information and belief, MSA Sportworks Ltd. ("MSA "Ltd."), is a corporation organized under the laws of Canada, having its principal place of business located at 115B 19705 Fraser Highway, Langley, B.C. Canada V3A 7E9.

14.     On information and belief, Vancouver Ravens Lacrosse Club, Inc. is a corporation organized under the laws of Canada, having its principal place of business located at 800 Griffiths Way, Vancouver, B.C., Canada V6B 6G1.

15.     On information and belief, Paul Reinhart is a citizen of Canada, who resides at 800 Griffiths Way, Vancouver, B.C., Canada V6B 6G1.

16.     On information and belief, Vancouver Ravens Lacrosse Club Limited Partnership is a corporation organized under the laws of Canada, having its principal place of business located at 800 Griffiths Way, Vancouver, B.C., Canada V6B 6G1.

17.    On information and belief, Partners Group, 1 Inc., is a corporation organized under the laws of the State of Delaware, having its principal place of business located at 2665 Dallas Highway, Suite 410, Marietta, Georgia 30064.

18.    On information and belief, Raj Kalra is a citizen of the State of Georgia, who resides at 5997 Downington Pt, Acworth, Georgia 30101.

19.    On information and belief, Partners Group Ravens, Inc., is a corporation organized under the laws of Canada, having its principal place of business located at 18431 Tyotown Road, Cornwall, Ontario, Canada K6H 5R5.

20.    On information and belief, Consolidated General Inc., is a corporation organized under the laws of the State of Delaware, having its principal place of business located at 2665 Dallas Highway, Suite 410, Marietta, Georgia 30064.

21.    On information and belief, Westcap Business Centre, Inc. ("Westcap"), is a corporation organized under the laws of Canada, having its principal place of business located at 3933 Parkway Drive, Vancouver, B.C., Canada VGL 3C9.

22.    On information and belief, Steven Brian Friedland, trustee for the so called secured note holders (the so called secured note holders are Tom Mayenknecht, Steven Brian Friedland d/b/a Western Liquid Capital, David Stadnyk, Beverly Hoffman, Bruce Byrnell, Lorraine Groombridge, Rob Slaney, Chris Leduc, Hans Mayenknecht, Dennis Amundsen, Garry Penny, David Lough, Steve Simon and Bob Smith, collectively the so called "Note Holders") is a citizen of Canada, who resides at 3933 Parkway Drive, Vancouver, B.C., Canada VGL 3C9.

23.    On information and belief, Western Liquid Capital is a corporation organized under the laws of Canada, having its principal place of business located at 3933 Parkway Drive, Vancouver, B.C., Canada VGL 3C9.

24.    On information and belief, CB Wilson Capital, Ltd. is a corporation organized

under the laws of Canada, having its principal place of business located at P.O. Box 48755, 595

Burrard Street, Vancouver, B.C., Canada V7X 1A6.

## STATEMENT OF FACTS

**A.    Application for NLL Membership**

25.    On March 9, 2001, SMS, d/b/a Starlight, submitted an executed application (the

"Application") for an NLL expansion license to operate a club in Vancouver, British Columbia.

*See* National Lacrosse League Application for Membership, attached hereto as **Exhibit A**.  The

Application listed David Stadnyk, Tom Mayenknecht and Robert Smart as shareholders, owners,

investors, partners or individuals as having ownership interests in SMS, d/b/a Starlight.

26.    Specifically, the Application sought membership in the NLL and for all rights of

membership including, but not limited to, a license to play indoor lacrosse in Vancouver, British

Columbia, on the terms and conditions set forth in the Application, and in the NLL Constitution,

By-Laws and League Regulations and Policies promulgated thereunder.

27.    Moreover, the Application bound SMS, d/b/a Starlight:

> to comply with all terms and conditions of the vote concerning
> their admission to membership in the [NLL] and of the [NLL]
> Constitution, By - Laws and Regulations, as amended from time to
> time, and [to] state that by the acceptance of a franchise as a
> member club [SMS, d/b/a Starlight] shall be deemed to have
> contracted with every other member club, and with the [NLL], to
> perform in accordance with the [NLL] Constitution, By-Laws and
> Regulations and to comply with the stated policies of the [NLL].
> [SMS, d/b/a Starlight] execution of this application will signify
> that [they] have read the referenced sections and that the applicant
> agrees to be so bound.

*See* Ex. A.

28.    The Application was approved by the NLL Board of Governors and the parties

entered into an agreement for purchase of the membership rights on April 5, 2001, for

consideration to be paid by SMS, d/b/a Starlight to the NLL in the amount of $500,000.  *See*

Agreement for Purchase, attached hereto as **Exhibit B**.

29.     Upon information and belief, SMS changed its name to MSA Inc. and/or MSA Ltd. and began operating the Vancouver Ravens Lacrosse Club, Inc. (the "Club").

30.     On information and belief, on or about October 25, 2001, Paul Reinhart acquired a 50% interest in the Club in exchange for an equity investment of $425,000.

**B.     The NLL Constitution**

31.     Section 3.12(a) of the NLL Constitution provides for automatic involuntary termination of a member club upon the occurrence of certain events, including if the member club "disband[s] its team during the [NLL] season or play-offs, disband[s] its business organization, or ceases its business[,] or fails to secure a facility lease to play games at a facility suitable to the [NLL] at any time after the release of the [NLL]'s schedule."

32.     The effect of termination upon a member club's ownership interest is governed by section 3.15 of the NLL Constitution:

> Whenever any person or member is requested to sell or dispose of its stock or an interest in a membership in the [NLL] by reason of an expulsion or other involuntary termination, such sale or disposition must by completed within one hundred twenty (120) days after such action has been ordered.  … In the event the membership interest has not been transferred in accordance with [the NLL Constitution] within 120 days from the date such action was ordered, the ownership interest shall revert to and vest in the [NLL] and member shall have no further ownership rights in the [NLL] or said membership.

33.     On June 14, 2005 the NLL Board of Governors voted to modify section 3.15 of the NLL Constitution.  Such action was duly made in accordance with section 5.9 of the NLL Constitution.  Moreover, the NLL Constitution provides that all members clubs accept and agree to abide by the NLL Constitution and "each and every alternation, amendment or repeal thereof duly made."

**C.     Paul Reinhart's Proposed Acquisition**

34.    On information and belief, on or around September 2002, Paul Reinhart proposed to acquire the remaining 50% interest in the Club.

35.    On information and belief, as part of the foregoing transaction, all of the Club's assets were to be transferred to a newly formed entity called the Vancouver Ravens Lacrosse Club Limited Partnership.

36.    The closing of this transaction never occurred and the Club's assets were never transferred to the Vancouver Ravens Lacrosse Club Limited Partnership.

**D.    The Club's Operation**

37.    The Club operated for the 2001-02, 2002-03 and 2003-04 NLL lacrosse seasons.

38.    The NLL has not received any dues or assessment from the Club since 2004.

**E.    Partners Group 1Inc.**

39.    On or about March 9, 2004, Partners Group 1Inc. submitted an application for membership in the NLL to operate the Club. The application listed Raj Kalra as 100% owner of Partners Group 1Inc.

40.    On or about March 19, 2004 the NLL Board of Governors conditionally approved the application of Partners Group 1Inc., subject to satisfaction of a number of conditions.

41.    On information and belief, Partners Group 1Inc. created Partners Group Ravens Inc. to operate the Club.

42.    On or about June 11, 2004, in an effort to induce the NLL to approve transfer of the Club to Partners Group Ravens Inc., Partners Group 1Inc. states that all conditions for approval have been satisfied, including the establishment and maintenance of an escrow of $500,000 worth of shares of Consolidated General Inc., a company purportedly owned by Raj Kalra. The letter actually refers to shares of Java Group Inc., but on information and belief, Java Group Inc. changed its name to Consolidated General Inc. on September 7, 2004.

- 8 -

43.    However, all conditions were not satisfied and an effective transfer did not occur.

**F.    The Club's Financial Difficulties**

44.    In November 2004, the NLL notified the Club that it was investigating complaints from several parties with respect to claims that various monies were due and owing by the Club. At that time, the NLL also notified the Club that if the foregoing complaints were true, the NLL may file charges under the NLL Constitution to terminate the Club's membership rights for "failing or refusing to fulfill contractual obligations in such a way as to adversely affect the [NLL]."

45.    As of November 15, 2004, the Club did not have an arena secured for the 2005 season due to their financial instability.

46.    As a result of the foregoing, the NLL initiated involuntary suspension proceedings under the NLL Constitution.

**G.    Westcap's Proposed Operation of the Club**

47.    In December 2004, the NLL entered into an agreement with the Club and Westcap (trustee for certain so called note holders), to permit the parties-in-interest an opportunity to continue operations of the Club for the 2005 season.

48.    Under the terms of the agreement, Westcap and the Club were to satisfy a number of conditions, including:  secure a playing facility lease, post a letter of credit and secure funding for operations for the season.

49.    Westcap and the Club were unable to satisfy the conditions of the agreement and the Club was removed from the 2005 schedule.

**H.    So Called Note Holders' Liens**

50.    On or about December 10, 2004, Steven Brian Friedland d/b/a Western Liquid Capital filed a General Security Agreement ("GSA") on behalf of the so called Note Holders

asserting liens against all assets of MSA Inc. and the Club.

51.    The GSA was extended for an additional three years beginning December 8, 2006.

**I.    Automatic Termination of the Club's Membership**

52.    On December 15, 2004, the Club's membership was automatically terminated in accordance with section 3.12(a)(ii) of the NLL Constitution "due to the disbanding of the team and cessation of the business of the club."

53.    Under the terms of section 3.15 of the NLL Constitution, the Club was directed to sell its interests within 120 days.

**J.    Prospective Sale of Club's Membership Interests**

54.    On April 14, 2005, a letter of intent was submitted by CB Wilson Capital for the sale of the club to be paid by issuance of 400,000 shares of the purchaser. The letter of intent also set forth a closing date of May 31, 2005.

55.    The NLL promptly advised the parties that the proposed transfer would not qualify under the NLL Constitution and a qualified transfer was never achieved.

**COUNT I: DECLARATORY JUDGMENT**
**(Membership interests of defendants SMS, Starlight, Club, Stadnyk,**
**Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart have terminated)**

56.    NLL re-alleges the allegations of paragraphs 1 though 55 of this complaint and incorporates these allegations by reference as if fully set forth herein.

57.    NLL fully performed its obligations, and all conditions precedent under the NLL Constitution.

58.    Defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart's membership interests were automatically terminable under the NLL Constitution upon the occurrence of certain events, including if the defendants "disband its team

during the [NLL] season or play-offs, disband its business organization, or ceases its business[,] or fails to secure a facility lease to play games at a facility suitable to the [NLL] at any time after the release of the [NLL]'s schedule."

59.    Defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd., and Reinhart were not able to secure a playing facility for the 2005 season.

60.    The Club was removed from the schedule for the 2005 season.

61.    On or about December 15, 2004, the NLL notified the Club that its membership was automatically terminated under section 3.15 of the NLL Constitution.

62.    On or about December 15, 2004, the NLL also directed the Club to sell its membership interests within 120 days.

63.    Defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart failed to sell their membership interests within 120 days as required under the NLL Constitution.

64.    Defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart's membership interests lawfully and properly reverted back to the NLL.

65.    NLL maintains that the membership interests of defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart properly reverted back to NLL.

66.    The defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart maintain that they still have membership interests.

67.    An actual controversy therefore exists between the parties within the meaning of 28 U.S.C. § 2201.

### COUNT II : BREACH OF CONTRACT
### (Breach of the NLL Constitution)

68.    NLL re-alleges the allegations of paragraphs 1 though 67 of this complaint and

- 11 -

incorporates these allegations by reference as if fully set forth herein.

69.     Defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart breached the NLL Constitution by failing:  (a) to provide verified financial information evidencing an ability to operate the Club; (b) to secure an arena for the 2005 season; (c) to meet continuing obligations; and (d) to be in good standing with the NLL by being current on dues and posting a letter of credit.

70.     The NLL has not received any dues or assessments from the Club since 2004.

71.     Defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart breached the NLL Constitution by:  (1) failing and refusing to pay the NLL $1,607.520, inclusive of all accrued dues, assessments, outstanding fines, late charges and interest, which remains due and owing; and (2) by failing to operate the Club causing the NLL to incur loss revenues in an amount of no less than $2.5 million.

72.     As a result of defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart breach of the NLL Constitution, the NLL has suffered damages in an amount in excess of $4 million.

### COUNT III: DECLARATORY JUDGMENT
**(Neither Paul Reinhart nor the Vancouver Ravens Lacrosse Club Limited Partnership have any membership interests in the NLL)**

73.     NLL re-alleges the allegations of paragraphs 1 though 72 of this complaint and incorporates these allegations by reference as if fully set forth herein.

74.     On information and belief, on or around September 2002, Paul Reinhart proposed to acquire the remaining 50% interest in the Club.

75.     On information and belief, as part of the foregoing transaction, all of the Club's assets were to be transferred to a newly formed entity called the Vancouver Ravens Lacrosse Club Limited Partnership.

76.    The closing of this transaction never occurred and the Club's assets were never transferred to the Vancouver Ravens Lacrosse Club Limited Partnership.

77.    The NLL is entitled to a declaratory judgment against Paul Reinhart and the Vancouver Ravens Lacrosse Club Limited Partnership declaring that Paul Reinhart and the Vancouver Ravens Lacrosse Club Limited Partnership have no membership interests in the NLL.

## COUNT IV: DECLARATORY JUDGMENT
### (Neither Partners Group 1Inc, Raj Kalra, Partners Group Ravens, Inc.
### nor Consolidated General have any membership interests in the NLL)

78.    NLL re-alleges the allegations of paragraphs 1 though 77 of this complaint and incorporates these allegations by reference as if fully set forth herein.

79.    On or about March 9, 2004, Partners Group 1Inc. submitted an application for membership in the NLL to operate the Club.  The application listed Raj Kalra as 100% owner of Partners Group 1Inc.

80.    On or about March 19, 2004 the NLL Board of Governors conditionally approved the application of Partners Group 1Inc., subject to satisfaction of a number of conditions.

81.    On information and belief, Partners Group 1Inc. created Partners Group Ravens Inc. to operate the Club.

82.    On or about June 11, 2004, in an effort to induce the NLL to approve transfer of the Club to Partners Group Ravens Inc., Partners Group 1Inc. states that all conditions for approval have been satisfied, including the establishment of and maintenance of an escrow of $500,000 worth of shares of Consolidated General Inc., a company purportedly owned by Raj Kalra.  The letter actually refers to shares of Java Group Inc., but on information and belief, Java Group Inc. changed its name to Consolidated General Inc. on September 7, 2004.

83.    The NLL fully performed its obligations, and all conditions precedent to facilitate the proposed transfer.

84.    However, defendants Partners Group 1Inc, Raj Kalra, Partners Group Ravens, Inc. and Consolidated General did not satisfy all conditions and an effective transfer did not occur.

85.    The NLL is entitled to a declaratory judgment against defendants Partners Group 1Inc, Raj Kalra, Partners Group Ravens, Inc. and Consolidated General declaring that Partners Group 1Inc, Raj Kalra, Partners Group Ravens, Inc. and Consolidated General have no membership interests in the NLL.

## COUNT V: BREACH OF CONTRACT
### (Breach of Purchase Agreement)

86.    NLL re-alleges the allegations of paragraphs 1 though 85 of this complaint and incorporates these allegations by reference as if fully set forth herein.

87.    Defendants Partners Group 1Inc, Raj Kalra, Partners Group Ravens, Inc. and Consolidated General breached the asset purchase agreement by failing to fulfill their obligations thereunder.

88.    As a result of defendants Partners Group 1Inc, Raj Kalra, Partners Group Ravens, Inc. and Consolidated General's breach of the asset purchase agreement and the subsequent non-operation of the Club, the NLL suffered actual damages in the form of loss revenue in an amount of no less than $2.5 million.

## COUNT VI: DECLARATORY JUDGMENT
### (Westcap has no membership interests in the NLL)

89.    NLL re-alleges the allegations of paragraphs 1 though 88 of this complaint and incorporates these allegations by reference as if fully set forth herein.

90.    In December 2004, the NLL entered into an agreement with Westcap to permit the parties-in-interest an opportunity to continue operations of the Club for the 2005 season.

91.    Under the terms of the agreement, Westcap was to satisfy a number of conditions,

including: secure a playing facility lease, post a letter of credit and secure funding for operations for the season.

92.     Westcap was unable to satisfy the conditions of the agreement and the Club was removed from the 2005 schedule.

93.     Any rights that Westcap may have had under the agreement lawfully and properly reverted back to the NLL.

94.     The NLL is entitled to a declaratory judgment against Westcap declaring that Westcap has no membership interests in the NLL.

## COUNT VII: DECLARATORY JUDGMENT
**(Steven Brian Friedland, d/b/a Western Liquid Capital, as Trustee for the so called secured Note Holders has no membership interests in and/or liens against the NLL)**

95.     NLL re-alleges the allegations of paragraphs 1 though 94 of this complaint and incorporates these allegations by reference as if fully set forth herein.

96.     On or about December 10, 2004, Steven Brian Friedland d/b/a Western Liquid Capital filed a General Security Agreement ("GSA") on behalf of the so called Note Holders asserting liens against all assets of MSA Inc. and the Club.

97.     The GSA was extended for an additional three years beginning December 8, 2006.

98.     The membership interests of defendants MSA Inc. and the Club lawfully and properly reverted back to the NLL when MSA Inc. and the Club failed to sell their interests within 120 days after automatic termination of the Club's membership.

99.     NLL maintains that defendants MSA Inc. and the Club's membership interests properly reverted back to NLL, and defendant Steven Brian Friedland, as Trustee for the so called Note Holders, d/b/a Western Liquid Capital, do not have any membership interests in or liens against the NLL.

100.    The defendants Steven Brian Friedland, as Trustee for the so called Note Holders, d/b/a Western Liquid Capital maintain that they still have membership interests in or liens against the NLL.

101.    An actual controversy therefore exists between the parties within the meaning of 28 U.S.C. § 2201.

### COUNT VIII: DECLARATORY JUDGMENT
### (CB Wilson Capital has no membership interests in the NLL)

102.    NLL re-alleges the allegations of paragraphs 1 though 101 of this complaint and incorporates these allegations by reference as if fully set forth herein.

103.    On or about April 14, 2005, a letter of intent was submitted by CB Wilson Capital for the purchase of the Club to be paid by issuance of 400,000 shares of the purchaser. The letter of intent also set forth a closing date of May 31, 2005.

104.    The NLL promptly advised the parties that the proposed transfer would not qualify under the NLL Constitution and a qualified transfer was never achieved.

105.    Any rights that CB Wilson Capital may have had under the proposed transfer have reverted back to and properly belong to the NLL.

106.    The NLL is entitled to a declaratory judgment against CB Wilson Capital declaring that CB Wilson Capital has no membership interests in the NLL.

**WHEREFORE**, the NLL respectfully requests judgment in its favor and against:

    (a)    defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart in the form of a declaration that defendants membership interests have been terminated and that such interests have lawfully and properly reverted back to the NLL; and

    (b)    defendants SMS, Starlight, Club, Stadnyk, Mayenknecht, Smart, MSA Inc., MSA Ltd. and Reinhart in an amount in excess of $4 million, or such other amount as will be proven at trial; and

    (c)    defendants Paul Reinhart and the Vancouver Ravens Lacrosse Club Limited Partnership in the form of a declaration that defendants have no

membership interests in the NLL; and

(d)    defendants Partners Group 1Inc., Raj Kalra, Partners Group Ravens, Inc. and Consolidated General Inc. in the form of a declaration that defendants have no membership interests in the NLL; and

(e)    defendants Partners Group 1Inc., Raj Kalra, Partners Group Ravens, Inc. and Consolidated General Inc. in an amount in excess of $2.5 million, or such other amount as will be proven at trial; and

(f)    defendant Westcap in the form of a declaration that defendant has no membership interests in the NLL; and

(g)    defendants Steven Brian Friedland, as Trustee for the so called secured note holders, d/b/a Western Liquid Capital, in the form of a declaration that defendants have no membership interests in and/or liens against the NLL; and

(h)    defendant CB Wilson Capital Ltd. in the form of a declaration that defendant has no membership interest in the NLL.

| Dated: New York, New York<br>        April 28, 2008 | SONNENSCHEIN NATH & ROSENTHAL LLP<br><br>By:  *Robert J. Lanza /JJ*<br>      Robert J. Lanza<br>      1221 Avenue of the Americas, 24th Floor<br>      New York, New York 10020<br>      Tel:   (212) 768-6700<br>      Fax:   (212) 768-6800<br><br>*Attorneys for the Plaintiff National Lacrosse League* |
| --- | --- |

# EXHIBIT A



# VANCOUVER RAVENS

## APPLICATION DOCUMENT

# NATIONAL LACROSSE LEAGUE
## APPLICATION FOR MEMBERSHIP

Applicant hereby applies for membership in the National Lacrosse League ("NLL") and for all rights of membership including, but not limited to, a franchise to play indoor lacrosse in a specific territory, on the terms and conditions set forth herein and in the National Lacrosse League Constitution, By-Laws, and League Regulations and Policies promulgated thereunder.

Applicant understands and agrees that submission of this application to the NLL constitutes an offer by applicant which the NLL is under no obligation to accept; that notwithstanding applicant's meeting all requirements for admission to membership in the NLL, the NLL is under no obligation to accept applicant's offer; that the NLL's decision as to whether or not to accept applicant's offer is solely within the discretion of the NLL Board of Governors; that the Board's rejection of the applicant's offer shall give rise to no rights or claim to the applicant; and that all decisions with respect to the applicant's offer are decisions solely within the absolute discretion of the NLL Board of Governors.

This application must be accompanied by a certified or cashier's check for $5,000.00 payable to the NLL as the applicant's non-refundable Application Fee in order to defray the costs, expenses and fees incurred by the NLL in investigating and assessing the applicant and the application. In the event the applicant desires a special meeting of the NLL Board of Governors to act upon this application, the applicant understands and agrees that it shall pay all costs of such a meeting at such time and in such form as required by the NLL. Should the applicant eventually be granted a franchise, the $5,000 application fee will be credited towards its franchise fee.

In submitting this offer for membership in the NLL, the applicant:

     A.   certifies that all responses herein and all other information submitted in support and furtherance thereof is true, correct and complete;

     B.  authorizes the NLL to make such investigation and conduct such due diligence of the information provided herein, and to use the information set forth herein and disclosed by any such investigation as the NLL, in its sole discretion, deems necessary or appropriate and, in furtherance thereof, the applicant authorizes the NLL to contact any persons or entities which it, in its sole discretion, deems appropriate; and

     C.  agrees to furnish any and all additional information as may be requested by the NLL, including those documents listed in Exhibit A.

For purposes of the application, the "applicant" shall be: (i) the person or entity (corporation, partnership, etc.) submitting this application, and (ii) the subsidiaries, parent, affiliates, officers and directors, and (iii) all of the stockholders, partners or principals of the entity, now or as proposed, as applicable from time to time.

**PLEASE TYPE OR PRINT - USE EXTRA SHEETS IF NECESSARY**

1. **APPLICANT**

Name, address and firm (i.e., corporation, partnership, etc.) of applicant. (If corporation, give jurisdiction which granted charter; if partnership, give jurisdiction.)

SMS SPORTWORKS ENTERTAINMENT (currently Starlight Sports & Ent.)

SUITE 100-876 HOMER STREET, VANCOUVER, B.C. CANADA

Attached hereto as Exhibit 1 are all instruments, documents and agreements providing for or relating to the formation, organization, ownership and operation of applicant. The applicant must be the person or entity which will be the member of the NLL, and, as such, will hold the franchise and all player rights, broadcast right and lease rights.

2. **PROPOSED HOME TERRITORY**

City and state for which application is made.

VANCOUVER / BRITISH COLUMBIA

3. **OWNERSHIP OF APPLICANT**

(a) Names, addresses and percentage ownership interest of all shareholders, owners, investors or partners of applicant.

| NAMES AND ADDRESSES | PERCENTAGE INTEREST |
|---|---|
| (i) DAVID STADNYK<br>4756 DRUMMOND DRIVE<br>VANCOUVER, BRITISH COLUMBIA | 100% |
| (ii) TOM MAYENKNECHT<br>552 ST. ANDREWS ROAD, WEST VANCOUVER<br>V7S 1V2 | — |
| (iii) ROBERT SMART<br>662 ALPINE COURT, NORTH VANCOUVER<br>V7R 2L8 | — |

| **NAMES AND ADDRESSES** | **PERCENTAGE INTEREST** |
|---|---|
| (iv) _____ | _____ |
| _____ | |
| (v) _____ | _____ |
| _____ | |

Attached as Exhibit 2 are resumés containing background and biographical information for each of the persons listed above. Each person listed above waives the confidentiality of the information supplied with this application and authorizes the NLL to conduct such character and other investigations as the NLL believes necessary to properly evaluate this application.

   (b) Has any of the persons listed in (a) above ever been convicted of a felony or of a crime involving moral turpitude?

**YES** __     **NO** ✓

If yes, provide all details of the matter, including the persons or entities involved and the disposition of the matter.

_____

_____

_____

## 4. PROPOSED GOVERNORS

Identify who applicant proposes will serve as Governor and Alternate Governor.

Governor: TOM MAYENKNECHT of WEST VANCOUVER, B.C.

Alternate: ROBERT SMART of NORTH VANCOUVER, B.C.

## 5. FINANCIAL INFORMATION

(a) Attached hereto as Exhibit 3 and forming part of this application is a current balance sheet and the most recent two years' income statements (all certified by an independent firm certified public accountants) of each person and entity listed in Item 3.

(b) Exhibit 3 must also include a summary of the capitalization of the applicant and a detailed estimate of cash flow of operations for the first two years of membership in the NLL granted, including estimated attendance and average ticket price.

6. **CREDIT INFORMATION**

(a) Has the applicant (which included each person and entity listed in Item 3) filed (voluntarily or involuntarily) under the Federal Bankruptcy Code or any similar state statute(s) within the last seven (7) years?

YES ___     NO ✓

If yes, provide all details of the matter including the persons or entities involved and the disposition of the matter.

_____

_____

_____

(b) Name and address of official representative of the applicant to whom all communications relevant to this application should be directed:

TOM MAYENKNECHT , MANAGING PARTNER

VANCOUVER RAVENS LACROSSE CLUB

c/o SMS SPORTWORKS ENTERTAINMENT

100 - 856 HOMER STREET
VANCOUVER, BRITISH COLUMBIA

(c) If different from (a) above, the name and address of the chief executive officer or managing general partner of the applicant.

SAME

_____

_____

7. **PLAYING FACILITY**

(a) Name and address of arena proposed to be used.

GENERAL MOTORS PLACE

800 GRIFFITHS WAY

VANCOUVER, BRITISH COLUMBIA  V6B 6G1

SEATING CAPACITY: 18,422

DIMENSIONS OF PLAYING SURFACE: 200 FEET BY 85 FEET

(b) Name and address of arena owner and name, and address and telephone number of arena manager.

ORCA BAY ARENA CORPORATION

ORCA BAY SPORTS & ENTERTAINMENT

800 GRIFFITHS WAY

VANCOUVER, BRITISH COLUMBIA

V6B 6G1

(c) Provide full details as to practice facilities to be available to team.

TO BE CONFIRMED

## 8. LEAGUE REQUIREMENT

Sections 3.5 and 3.16 of the Constitution bind members of the League to comply with all terms and conditions of the vote concerning their admission to membership in the League and of the League Constitution, By - Laws and Regulations, as amended from time to time, and state that by the acceptance of a franchise as a member club each member club shall be deemed to have contracted with every other member club, and with the League, to perform in accordance with the League Constitution, By-Laws and Regulations and to comply with the stated policies of the League.    Your execution of this application will signify that you have read the referenced sections and that the applicant agrees to be so bound.

APPLICANT

SMS SPORTWORKS ENTERTAINMENT

DATE: _MARCH 9, 2001_

BY: _Tom May_

OFFICIAL    TOM MAYENKNECHT,
MANAGING PARTNER

REPRESENTATIVE

# EXHIBIT B

# AGREEMENT FOR PURCHASE

This Agreement for the **Purchase and Sale** of Membership ("Agreement") is entered into this __5__ day of __April__, 2001 between **NATIONAL LACROSSE LEAGUE INC** (the "Seller") and **STARLIGHT SPORTS AND ENTERTAINMENT INC.** (herein referred to as "Buyer" or "Buyers").

**WHEREAS**, Seller is the governing body for professional indoor lacrosse in North America and issues memberships to qualified applicants pursuant to By-laws and Constitution of the National Lacrosse League

**WHEREAS**, Buyer is desirous of acquiring an expansion membership for Vancouver, British Columbia;

Now, therefore, in consideration of the mutual covenants and conditions contained herein, the parties agree as follows:

1. **Property to be Purchased.** Subject to the terms and conditions contained in this Agreement, Buyer shall purchase from Seller, and Seller shall issue to Buyer an NLL expansion team membership for Vancouver, British Columbia.

2. **Purchase Price and Allocation of Purchase Price.** The purchase price ("Purchase Price") shall be Five Hundred Thousand and No/100 ($500,000.00) U.S. Dollars which shall be payable as follows:

   | | |
   |---|---|
   | (a) Cash or certified check upon Application | $ 5,000.00 |
   | (b) Cash or certified check at closing | $100,000.00 |
   | (c) Promissory Note due on or before June 15, 2001 | $395,000.00 |

3. **Closing.** The Closing ("Closing") of this Agreement shall take place on or before April 4, 2001

-1-

3.1 <u>Seller's Obligations.</u>  At Closing, Seller shall have the following obligations:  (i) execute a Certificate of Membership;  (ii) any other documents necessary to effect the transaction contemplated herein.

3.2 <u>Buyer's Obligations.</u>  At Closing, Buyer shall have the following obligations: (i) deliver $100,000.00 by cashier's check or money order; (ii) executed Promissory Note and Security Agreement in a form acceptable to the Seller.

4. **Non-Assignability.**  Neither Buyer nor Seller may assign this Agreement.

5. **Further Assurances.**  Following the Closing, the parties shall, at the request of the other party, and without further consideration, execute and deliver such other documents and take such other actions as may be reasonably required to carry out the transactions contemplated by this Agreement.

6. **Survival of Representations and Warranties.**  All representations, warranties and releases made in this Agreement shall survive the Closing of this Agreement.

7. **Amendment.**  No modification, termination or amendment of this Agreement may be made except by written agreement signed by all parties, except as provided herein.

8. **Waiver.**  No failure by any of the foregoing parties to insist upon the strict performance of any covenant, duty, agreement, or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, agreement, term or condition.

9. **Captions.**  The captions of this Agreement are for convenience and reference only and in no way define, limit, or describe the scope or intent of this Agreement.

10. **Severability.**  In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof.

-2-

**11. Counterparts.** This Agreement may be executed in any number of counterparts and by facsimile, and each such counterpart hereof and faxed signature shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

**12. Neutral Authorship.** Each of the provisions of this Agreement has been reviewed and negotiated, and represents the combined work product of all parties hereto. No presumption or other rules of construction which would interpret the provisions of this Agreement in favor of or against the party preparing the same shall be applicable in connection with the construction or interpretation of any of the provisions of this Agreement.

**13. Governing Law.** This Agreement and the right of the parties hereto shall be governed by and construed in accordance with the laws of the State of New Jersey and the parties agree that in any such action venue shall lie exclusively in Bergen County, New Jersey.

**14. Time of Performance.** Time is specifically declared to be of the essence of this Agreement and of all acts required to be done and performed by the parties hereto.

**15. Entire Agreement.** The entire agreement between the parties hereto is contained in this Agreement and the exhibits hereto; and this Agreement supersedes all of their previous understandings and agreements, written and oral, with respect to this transaction. This Agreement may be amended only by written instrument executed by the parties subsequent to the date hereof.

**NATIONAL LACROSSE LEAGUE INC.**

BY: _____

JIM JENNINGS, COMMISSIONER

**BUYER**

_____

STARLIGHT SPORTS & ENTERTAINMENT INC.

-3-

## PROMISSORY NOTE

FOR VALUE RECEIVED, the receipt of which is hereby acknowledged and intending to be legally bound, **Starlight Sports and Entertainment Inc.** promises to pay to the order of the National Lacrosse League Inc., its successors and assigns, the sum of THREE HUNDRED NINETY-FIVE THOUSAND ($395,000.00) U.S. DOLLARS payable or before June 15, 2001.

This Note is secured by a Security Agreement executed as of the date herewith between the National Lacrosse League Inc. as the "Secured Party" and **Starlight Sports and Entertainment Inc.** as the Debtor.

This Note shall be governed and construed in accordance with the laws of the State of New Jersey.  The debtor's non-payment of the full amount due under this note on or before June 15, 2001 shall be deemed a default under this Note.

Any amounts due under this Note remaining unpaid after June 15, 2001 shall accrue interest at the rate of 18% per annum in favor of the National Lacrosse League Inc.

**Starlight Sports and Entertainment Inc.**

BY: _____
DEBTOR

DATE: 5 April 2001

## GUARANTEE

The undersigned hereby absolutely and unconditionally guarantees the full and prompt payment of all obligations and liabilities of the Debtor under the above agreement with National Lacrosse League.  The aforementioned guarantee shall not to be affected in any manner by (and shall remain in full force and effect) notwithstanding any amendment or change in any provision of the promissory or any waiver or forbearance by the National Lacrosse League thereunder.

BY: _____

# SECURITY AGREEMENT

This Security Agreement ("Security Agreement") is made this __5TH__ day of APRIL, 2001 by and between National Lacrosse League Inc. ("Secured Party") and Tom Mayenknecht ("Owner").

**Section 1. Grant of Security Interest.** Owner, in consideration of the agreements, conditions and covenants described in this Security Agreement, hereby grants, conveys, and assigns to Secured Party for security, all of Owner's existing and future right, title and interest in, to and under the property listed in Section 2 of this Agreement. This security interest is granted to the Secured Party to secure payment of THREE HUNDRED, NINETY-FIVE THOUSAND ($395,000.00) U.S. DOLLARS for payment of the balance of the expansion fee payable to the National Lacrosse League by Starlight Sports and Entertainment Inc. for the Vancouver expansion team.

**Section 2. Property.** The property subject to the security interest ("Assets") is:

2.1 Assets.
    2.1.1   Owner's real property located at 552 St. Andrews Road, West Vancouver, BC.

2.2 After-Acquired Property. All property of the types described in Sections 2.1, or similar thereto, that at any time hereafter may be acquired by Owner including, but not limited to, all accessions, parts, additions, and replacements.

2.3 Proceeds. All proceeds of the sale or other disposition of any of the Assets described or referred to in Sections 2.1 through 2.2. Sale or disposition of Assets is prohibited except sales in the ordinary course of the Owner's business.

**Section 3. Covenants of Owner.** The Owner agrees and covenants as follows:

3.1 Ownership of Assets. The Owner is the sole owner of the Assets and will defend the Assets against the claims and demands of all other persons at any time claiming the same or any interest therein.

**Section 4. Perfection of Security Interest.** The Owner agrees to execute and file financing statements, and do whatever may be necessary under the applicable Uniform Commercial Code in the state or province where the Assets are located, to perfect and continue the Secured Party's interest in the Assets, all at the Owner's expense.

**Section 5. Taxes and Assessments.** The Owner will pay or cause to be paid promptly when due all taxes and assessments on the Assets on or before closing of the Agreement. The Owner shall have the obligation to pay all such taxes and assessments that may accrue between the date of execution of the Agreement and Closing. The Owner

- 1 -

may, however, withhold payment of any tax assessment or claim if a good faith dispute exists as to the obligation to pay.

**Section 6.** __Protection of Secured Party's Security.__  If the Owner fails to perform the covenants and agreements contained or incorporated in this Security Agreement and the Agreement, or if any action or proceeding is commenced which affects the Assets or title thereto or the interest of the Secured Party therein including, but not limited to, eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, then the Secured Party, at the Secured Party's option, may make such appearance, and take such action as the Secured Party deems necessary, in its sole discretion, to protect the Secured Party's interest including, but not limited to: (i) disbursement of attorneys' fees; (ii) make repairs to the Assets; and (iii) procurement of satisfactory insurance.  Any amounts disbursed by Secured Party pursuant to this Section, with interest thereon, shall become additional indebtedness of the Owner secured by this Security Agreement unless the Owner and the Secured Party agree to other terms of payment. Nothing contained in this Section shall require the Secured Party to incur any expense or take any action.

**Section 9.** __Forbearance by Secured Party Not a Waiver.__  Any forbearance by the Secured Party in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any right or remedy. The acceptance by the Secured Party of any action secured by this Security Agreement and the Agreement after the due date of such action, shall not be a waiver of the Secured Party's right to either require prompt action when due of all other actions so secured or to declare a default for failure to take prompt action.

**Section 10.** __Uniform Commercial Code Security Agreement.__  This Agreement is intended to be a security agreement pursuant to the Uniform Commercial Code for any of the items specified above as part of the Assets which, under applicable law, may be subject to a security interest pursuant to the Uniform Commercial Code, and the Owner hereby grants the Secured Party a security interest in said items. The Owner agrees that the Secured Party may file any appropriate document in the appropriate index as a financing statement for any of the items specified above as part of the Assets. In addition, the Owner agrees to execute and deliver to the Secured Party, upon the Secured Party's request, any financing statements, as well as extensions, renewals and amendments thereof, and reproductions of this Security Agreement and the Agreement in such form as the Secured Party may require to perfect a security interest with respect to said items. The Owner shall pay all costs of filing such financing statements and any extensions, renewals, amendments, and releases thereof, and shall pay all reasonable costs and expenses of any record searches for financing statements the Secured Party may reasonably require. Without the prior written consent of the Secured Party, the Owner shall not create or suffer to be created pursuant to the Uniform Commercial Code any other security interest in the Assets, including replacements and additions thereto. Upon the occurrence of an event of default, the Secured Party shall have the remedies of a secured party under the Uniform Commercial Code and, at the Secured Party's option, may also invoke the other remedies

-2-

provided in this Security Agreement and the Agreement as to such items. In exercising any of said remedies, the Secured Party may proceed against the items of real property and any items of personal property specified above as part of the Assets separately or together and in any order whatsoever, without in any way affecting the availability of the Secured Party's remedies under the Uniform Commercial Code or of the other remedies provided in this Agreement and the Services Agreement.

Section 11. Events of Default. The Owner shall be in default under this Security Agreement when any of the following events or conditions occurs:

11.1 Any default in the payment on the Promissory note dated March ___, 2001, or any portion thereof, with ten days of the receipt by Owner of written notice from the Secured Party of Owner's failure to pay in accordance with the Promissory Note.

11.2 The Owner fails to comply with any term, obligation, covenant, or condition contained in this Security Agreement and in the Agreement, within ten (10) days after receipt of written notice from the Secured Party demanding such compliance.

11.3 Any levy, seizure, attachment, lien, or encumbrance of or on the Assets which is not discharged by the Owner within ten (10) days or, any sale, transfer, or disposition of any interest in the Assets, without the written consent of the Secured Party.

Section 12. Acceleration in Case of Borrower's Insolvency. If the Owner voluntarily files a petition under the federal Bankruptcy Act, as such Act may from time-to-time be amended, or under any similar or successor federal statute relating to bankruptcy, insolvency, arrangements or reorganizations, or under any state bankruptcy or insolvency act, or files an answer in an involuntary proceeding admitting insolvency or inability to pay debts, or if the Owner is adjudged a bankrupt, or if a trustee or receiver is appointed for the Owner's property, or if the Assets becomes subject to the jurisdiction of a federal bankruptcy court or similar state court, or if the Owner makes an assignment for the benefit of its creditors, or if there is an attachment, receivership, execution or other judicial seizure, then the Secured Party may, at the Secured Party's option, declare all of the conditions and agreement secured by this Security Agreement to be immediately due and payable without prior notice to the Owner, and the Secured Party may invoke any remedies permitted by this Security Agreement. Any attorneys' fees and other expenses incurred by the Secured Party in connection with the Owner's bankruptcy or any of the other events described in this Section shall be additional indebtedness of the Owner secured by this Security Agreement.

Section 13. Rights of Secured Party. The Secured Party shall have possession of all Assets upon execution of the Agreement. The Owner shall have no right to possession of the Assets upon execution of the Agreement. The Owner shall have no right to encumber or bind the assets without the approval of the Secured Party in writing. Upon default or at any time before default when the Secured Party reasonably feels insecure, the Secured Party may elect to follow the procedures set forth in the Uniform Commercial

- 3 -

Code for retaining the Assets in satisfaction of the Owner's obligation, subject to the Owner's rights under such procedures.

Section 14. Waiver of Statute of Limitations. Owner hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien of this Security Agreement or to any action brought to enforce any other obligation secured by this Security Agreement and the Agreement.

Section 15. Waiver of Marshaling. Notwithstanding the existence of any other security interest in the Assets held by the Secured Party or by any other party, the Secured Party shall have the right to determine the order in which any or all of the Assets shall be subjected to the remedies provided by this Security Agreement and the Agreement. The Secured Party shall have the right to determine the order in which any or all portions of the indebtedness secured by this Security Agreement are satisfied from the proceeds realized upon the exercise of the remedies provided in this Security Agreement and the Agreement. The Owner, any party who consents to this Security Agreement, and any party who now or hereafter acquires a security interest in the Assets and who has actual or constructive notice of this Security Agreement, hereby waives any and all right to require the marshaling of assets in connection with the exercise of any of the remedies permitted by applicable law or by this Agreement and the Services Agreement.

Section 16. Provisions of Agreement/Incorporation of all terms of the Agreement. All of the terms and conditions of the Agreement are fully incorporated herein without further reference as if they were a part of this agreement. The Owner agrees to comply with the covenants and conditions of the Agreement. In case of a breach by the Owner of the covenants and conditions of the Services Agreement, the Secured Party, at the Secured Party's option may invoke any of the rights or remedies provided in the Agreement and this Security Agreement.

Section 17. Remedies Cumulative. Each remedy provided in this Agreement and the Services Agreement is distinct and cumulative to all other rights or remedies under this Security Agreement and the Agreement or afforded by law or equity, and may be exercised concurrently, independently, or successively, in any order whatsoever.

Owner:
Tom Mayeknecht

By:  TOM  MAYEKNECHT
Title:  GOVERNOR

VANCOUVER NLL
SMS SPORTWORKS ENTERTAINMENT

Secured Party:
NATIONAL LACROSSE LEAGUE INC.

By: JIM JENNINGS
Title: COMMISSIONER

- 4 -